O'MALLEY v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellant.*

Division Two, December 31, 1892.

1. **Negligence:** BURDEN OF PROOF. The burden of proof in actions for damages resulting from negligence rests on the party asserting it, and, unless such negligence is established by evidence legally sufficient, the action must fail.

O'Malley v. The Mo. Pac. Ry. Co.

2. ———: QUESTION OF LAW. Whether there is any evidence tending to establish the negligence charged, is a question of law for the court.

3. ———: QUESTION OF FACT. When the court has determined that there is evidence tending to prove the negligence as charged, it is the province of the jury to determine the sufficiency of the evidence to establish the negligence.

4. ———: RAILWAY TUNNEL: SERVANT'S DEATH FROM SMOKE, ETC. In an action against a railway company for the death of plaintiff's husband, employed in defendant's tunnel, through which it operated locomotives and cars, the petition charged that the tunnel, because the fan that ventilated it was out of repair, was in a dangerous condition, being filled with steam, smoke and poisonous gases; and that defendant, well knowing this fact, which was unknown to the deceased, negligently ordered him to go into the tunnel, whereby he was choked, strangled and killed. *Held*, that, as there was total failure of the evidence to show that the smoke in the tunnel when decedent entered was dangerous to human life, or to show that defendant could have anticipated a condition of the tunnel dangerous to human life, plaintiff could not recover.

*Appeal from St. Louis City Circuit Court.*—HON. JAMES E. WITHROW, Judge.

REVERSED.

*M. F. Watts* and *Tyson S. Dines* for appellant.

(1) The court erred in giving the instruction given for plaintiff. The demurrer to the evidence should have been sustained for the following separate and independent reasons, any one of which must be fatal to respondent's case: *First.* The evidence wholly failed to show a dangerous condition of the tunnel on the sixteenth day of May, 1887, when deceased entered. *Second.* Even if such dangerous condition existed, the evidence wholly failed to show any knowledge of such condition on the part of appellant, or of any facts which might suggest such condition to appellant. *Third.* The evidence failed to show the cause of the death of respondent's husband. *Fourth.* The risk, if any

existed, was manifestly one incident to the employment of deceased, and was assumed by him when he entered that employment.    He had been in defendant's employ, as one of the "tunnel gang," for five or six years, and had as good an opportunity as defendant, or any of its officers, servants or agents, to know of the condition of the tunnel.    *Priestly v. Fowler*, 3 M. & W. 1; *Railroad v. Davis*, 15 S. W. Rep. 895; *Tabler v. Railroad*, 93 Mo. 79; *Devitt v. Railroad*, 50 Mo. 302; *Price v. Railroad*, 77 Mo. 508; *Railroad v. Abbott*, 23 Atl. Rep. 310; *Railroad v. Thomas*, 42 Ala. 672. Authorities cited generally in support of the demurrer to the evidence.    *Cotton v. Wood*, 8 C. B. (N. S.) 568; *Hughes v. Railroad*, 16 S. W. Rep. 275; *Commissioners v. Clark*, 94 U. S. 284; *Powell v. Railroad*, 76 Mo. 80; *Bowen v. Railroad*, 95 Mo. 268; *Current v. Railroad*, 86 Mo. 62; *Armour v. Hahn*, 111 U. S. 313.

*J. R. Myers* and *J. M. Holmes* for respondent.

(1) The tunnel on the day in question was in an unusually dangerous condition, owing to the unusual accumulation of smoke and gas, caused by the stoppage for eight hours of the ventilator.    (2) The stoppage of the fan was not the result of an outside accident; it was stopped by the officers and agents of appellant, and appellant is chargeable with notice of the fact and of its necessary consequences.    *Kelly v. Railroad*, 75 Mo. 138; *Frick v. Railroad*, 75 Mo. 595; *Flynn v. Railroad*, 78 Mo. 208; *Russell v. Columbia*, 74 Mo. 480; *Bassett v. St. Joseph*, 53 Mo. 290; *Welsh v. St. Louis*, 73 Mo. 71; *Loewer v. Sedalia*, 77 Mo. 444; *Stevens v. Macon City*, 83 Mo. 357; Thompson on Trials, sec. 1706.    (3) The accumulation of smoke and gas on said day was sufficient to endanger human life, and that O'Malley was in point of fact suffocated by reason

of such accumulation. (4) No proof of contributory negligence on the part of O'Malley was shown, and contributory negligence cannot be presumed. *Buesching v. Gas Co.*, 73 Mo. 229. (5) There was no material variance between the allegations and the proof, and if there were appellant is not in a condition to avail itself of it. Revised Statutes, sec. 2096. (6) No warning of any kind was given to O'Malley as to the condition of the tunnel.

MACFARLANE, J.—The action is by plaintiff to recover the statutory damages for the death of her husband, John O'Malley, by reason of the alleged negligence of defendant.

The petition charged that defendant owned a railroad tunnel from the Union depot, in the city of St. Louis, under the city, to the bridge which crosses the Mississippi river, and was engaged on the sixteenth of May, 1887, in running locomotives and cars through the same; that, for the purpose of ventilating the same, and keeping it free from the accumulations of steam, smoke and noxious and poisonous gases, defendant operated a fan, placed in an air shaft leading into said tunnel; that without the aid of the ventilation produced by said fan said tunnel was liable to become filled with steam, smoke, noxious and poisonous gases to an extent which made it dangerous to enter therein; that, on said day, the said fan was not operated, and the tunnel, by reason thereof, had become filled, to an unusual degree, with steam, smoke and noxious gases, which was well known to defendant, and unknown to her husband, John O'Malley; that, while the tunnel was in this dangerous condition, defendant negligently ordered her said husband to go into the tunnel, and, by reason of obeying said order, he was choked, strangled and

killed by smoke, steam, vapor and poisonous gases. The answer was a general denial.

The evidence established the following undisputed facts:

The tunnel, with two railroad tracks, extends from the Union depot, in St. Louis, to the Mississippi river, a distance of forty-eight hundred feet, running first north from the depot, and curving to the east at the corner of Seventh and St. Charles streets. At the curve, for the purpose of ventilation, a large air shaft opens into the tunnel. This shaft is one hundred and twenty-five feet high, twenty feet in diameter at the base and nine feet at the top. In this shaft is constructed a fan about fifteen feet in diameter which is revolved by steam power. The last opening of the tunnel is about Main street. The same power which revolves the fan also generates electric lights in the tunnel. On the sixteenth of May, 1887, some of the machinery connected with the engine was under repair, and neither the fan nor electric lights were in use.

John Wynn was a roadmaster of defendant, who had superintendence of the tracks in defendant's yards and the tunnel. Under him a section foreman named Dean had charge of what is known as the "tunnel gang" of laborers who kept the tracks in the tunnel and near the entrances in order. John O'Malley, the husband of plaintiff, belonged to this "tunnel gang" under said foreman. Dean was about sixty-five years of age, of slight build, fair complexion, and had been employed in the same duties five or six years. While he belonged to the "tunnel gang" the evidence showed that his principal duties consisted in keeping the tracks in the yards near the entrance to the tunnel clean, though he was occasionally sent into it.

On the afternoon of May 16, 1887, Mr. Crews, an attorney, and McCune, a deputy marshal, called upon roadmaster Wynn and asked for foreman Dean, upon whom they wished to serve some legal papers. Wynn directed a man named Finnegan to go down to the yard, near the mouth of the tunnel, and point out Dean to them, and directed him, if he did not see Dean working in the yard, to see O'Malley who would probably know where Dean was working, and tell him to go a few feet into the tunnel and call Dean out. Finnegan went down with the two men and told O'Malley that Mr. Wynn wished him to find out where Dean was working and get him out. These men wished to see him on business. O'Malley informed them that Dean was working under Main street and advised them that if they would go to that entrance they would find him there at work. Nothing more was shown to have been said. Finnegan left, and O'Malley lit his lamp and went into the tunnel. This was between four and five o'clock in the afternoon. About 8:30 o'clock O'Malley was found about the middle of the tunnel dead. He was found lying a few feet from the track and had a small bruise under the eye, a bruise on the hip and one leg crushed between the knee and ankle. After he was taken out that night and also the next morning, his face was of a dark color and his lips bore a purple hue. Expert witnesses testified that the color of the face and lips indicated death from strangulation or asphyxiation. The same witnesses also gave their opinion as experts that death did not result from the injuries found upon him, though he may have died from the shock which followed the injuries. The evidence on certain vital questions will be considered more in detail in the opinion.

At the close of the evidence introduced by plaintiff, defendant asked an instruction to the effect that,

upon the pleadings and evidence, plaintiff could not recover. This the court refused. Defendant offered no evidence.

The issues were submitted to the jury upon a series of instructions to which no objection is made, except it is insisted that there was no evidence upon material questions of fact upon which they could properly have been predicated.

There are a few underlying legal principles which will aid us in determining whether there was evidence offered in the case, from which an inference of negligence could have been fairly drawn, which, though well settled, may be properly restated.

I. In actions for damages on account of injuries caused by negligence, the burden of proving the negligence always rests upon the party asserting it, and, unless it is shown by evidence legally sufficient, the action must fail. *Dowell v. Guthrie*, 99 Mo. 653; *Murray v. Railroad*, 101 Mo. 236.

II. It is the province of the court to determine all questions of law in the case. Whether there is any evidence tending to establish the negligence charged, is a question of law to be determined in all cases by the court. 2 Thompson on Trials, sec. 2242; *Boland v. Railroad*, 36 Mo. 484.

III. It is the province of the jury to determine all questions of fact. After the court has decided that there is evidence tending to prove negligence as charged, then it becomes the duty of the jury to determine the sufficiency of the evidence to establish such negligence. *Kelly v. Railroad*, 70 Mo. 604; *Richey v. Burnes*, 83 Mo. 362.

The court decided, by submitting the issues to the jury, that the evidence offered by plaintiff tended to prove that it was dangerous for deceased to enter the tunnel at the time he was directed by defendant to do so;

that defendant knew, or by proper caution should have known, of the danger, and that O'Malley died from suffocation by smoke, steam or gas by reason of obeying such direction. The only question we need consider is, whether the court correctly so decided. Unless there was evidence submitted from which an inference of all of these facts was fairly deducible, the court committed error in submitting the issues to the jury. The testimony was all offered by the plaintiff and there was no substantial conflict upon any of the material facts.

The evidence establishes beyond question that the fan was not operated on the day or night of the death of O'Malley, and in consequence the tunnel was more than usually full of smoke. The "tunnel gang" of trackmen to which deceased belonged were ordered not to work in the tunnel that day for the reason, as given by witnesses, that the machinery was under repair and light could not be furnished them. Hennessey, the man whose duty it was to examine the track, did not go through and make his examination at seven o'clock in the evening, which was the usual hour, for the reason, as he testified, that the density of the smoke at that hour prevented him from seeing and properly examining the track. He went through at eight o'clock and still found an unusual amount of smoke, but he experienced no difficulty in breathing.

All witnesses having knowledge of the tunnel testified, indeed it was conceded by defendant, that when the fan was not in operation the smoke did not escape near so rapidly as when it was in use. Trains through the tunnel were more frequent from six to nine o'clock in the morning, and from seven to nine o'clock in the evening. From five to seven in the afternoon but few trains passed through. How many passed through from four to five in the afternoon of the accident, or

generally, was not shown. On the other hand no witness testified directly to the existence of noxious or poisonous gases under any conditions or circumstances or to the effect burning coal had in the generation of gases, or that the smoke which filled the tunnel was ever sufficiently dense to become dangerous to human life.

It was shown by the undisputed evidence that the tunnel was open in 1874, and until 1882 no fan was in use; that employes had run through on engines and trains, and gangs of laborers had worked in the tunnel since it was opened, and no one had died or been injured from the accumulation of smoke, steam or gas. It was also shown that tunnels of the length of this one in this country were never provided with ventilating fans, air shafts being regarded as sufficient to remove all smoke and vapors.

The only evidence tending to prove that the death of O'Malley was caused by asphyxiation was the fact that six hours after his probable death the face was of a dark color and the lips of a purple tinge, which condition two doctors testified indicated death from strangulation or suffocation. On the other hand the bruises on the face and hip, and the crushed leg, and his position with reference to the track showed that deceased had been struck and thrown by an engine, and death may have resulted from the shock resulting therefrom.

Deceased had for five or six years been at work in the gang of men who kept the track in the tunnel and adjacent yards in repair, and, while his regular work was on the track outside, he was sent in there occasionally. He had his lamp ready for such an emergency. Instead of going to the Main street entrance, where he said Dean was working, by way of the streets overground, he elected to go by the way of the tunnel.

These facts are stated, not for the purpose of showing contributory negligence, which was not pleaded, but for the purpose of showing the familiarity of deceased with the passage through the tunnel.

We think the foregoing a fair statement of every material fact the evidence tends to prove. From these facts can we fairly draw the inferences that the tunnel was in a dangerous condition, that defendant knew its condition, and by reason of its condition O'Malley lost his life.

It is very clear that, in order to draw a general conclusion in the affirmative on these propositions, the existence of one fact is absolutely essential, viz., that smoke from the burning coal of engines, together with accompanying gases, in such quantities as are shown to have existed in the tunnel between four and five o'clock on the day in question, when the fan was not in operation, was dangerous to human life. This was a fact requiring proof and which the court had no right to assume. The nearest approach to proof of this essential fact consisted in the testimony of Hennessey, who had been engaged for seven years as track inspector, and Wynn, the roadmaster. The former testified that, at seven o'clock, the smoke was so dense that he could not see sufficiently to make an inspection; that when he went in at eight o'clock, the smoke was "pretty bad—worse that night than it used to be, because the fan was not in working order that night." The witness further testified: "I breathed just as good that night as I did any other night." Wynn, who for eleven years had charge of the tunnel as roadmaster, testified that he was familiar with the construction of the tunnel, that there was more or less smoke always when trains were passing to and fro; the more trains that pass, the thicker the smoke. A great many trains pass through.

O'Malley v. The Mo. Pac. Ry. Co.

"*Q.* Do you remember the fact that it was or was not a dangerous thing for a man to enter the tunnel on that day? *A.* I would not consider it dangerous myself to go in.

"*Q.* I will ask you to refresh your memory by reading this statement made at the time? *A.* I might have said this.

"*Q.* Might have said what? *A.* That it was a dangerous thing. What I mean would be that if any of those gentlemen should go down there and go in; but men that are in the employ around there, and accustomed to going in, we don't consider it dangerous at all."

There is nothing in this evidence from which we can fairly infer that the smoke in the tunnel, between four and five o'clock on the afternoon in question, was dangerous to human life. The reference by the road-master to danger, "to those gentlemen," evidently referred to dangers that strangers would encounter in the tunnel from running trains. We think there was a total failure of evidence on this vital question.

Though we should admit that O'Malley was suffocated by smoke and gas, there is no evidence which tends to prove that any officer of defendant could have anticipated a condition of the tunnel which was dangerous to human life. After thirteen years of use without the development of danger of injury or death from smoke and gas, unless it had been shown that defendant's roadmaster knew, or had means of knowledge, that unusual consequences would result to deceased from going into the tunnel on this occasion in obedience to the order, there was no negligence in giving such order, though in fact the tunnel at the time was filled with noxious and poisonous gases. Judgment reversed. All concur.