JOHN L. NAGLE, Respondent, v. LACLEDE GAS LIGHT COMPANY, Appellant.

St. Louis Court of Appeals.    Argued and Submitted November 13, 1912.    Opinion Filed December 14, 1912.

1. APPELLATE PRACTICE: Abstract: Amendment: Showing Filing of Motion for New Trial. A complete transcript of the record, and an abstract thereof prepared by appellant, showed that the judgment appealed from was rendered on March 8, at the February term, and that a motion for a new trial was filed on March 10. Upon the point being made by respondent that neither the transcript nor the abstract showed that said motion was filed at the same term at which the trial was had, as required by section 2025, Revised Statutes 1909, counsel for appellant suggested a diminution of the record, and *certiorari* was issued to the clerk of the circuit court, as provided by section 2052, Revised Statutes 1909. Said clerk thereupon filed a certificate, which, by agreement of counsel, was accepted in lieu of a complete transcript, and the record and abstract were amended, in conformity with said certificate, so as to show that on April 2, at the February term, the court entered an order of record continuing all demurrers, motions and causes, etc. *Held*, that said order furnishes evidence from which the appellate court can determine that the February term did not end until April 2, and hence it is *held* that the motion for new trial, filed on March 10, was filed at the February term.

2. NEGLIGENCE: Contributory Negligence: Taking Chance. Where a person does an act, knowing the danger of doing it, he will not be relieved of contributory negligence on the ground he thought he would take a chance.

3. MASTER AND SERVANT: Injury to Servant: Contributory Negligence: Unusual Accident: Liability of Master: Facts Stated. Plaintiff, a watchman at a gas plant, knew that, under the rules of the company and by the practice of its employees, repairs of leaks in a gas pipe located in a pit were to be made by at least two men and that the employee going into the pit

should use a respirator. He had been warned not to go into the pit alone, in case of a leak. When a plug came out of the pipe, permitting only a comparatively small amount of gas to escape, plaintiff and the other employees had been in the habit of. replacing it alone, without using the respirator, and had suffered no ill consequences from inhalation of gas, the time consumed in replacing the plug being very short. While plaintiff was on duty, a plug came out of the pipe, and he went into the pit alone to replace it, without using the respirator, and suffered injury as a result of inhaling gas. *Held*, that if the escape of gas in the pit was caused by a leak in the pipe, plaintiff was guilty of contributory negligence in going into the pit alone and thereby embracing a danger which he had been warned about and which was obvious. *Held, further*, that if the escape of gas in the pit was caused by a plug coming out of the pipe, defendant was guilty of no actionable negligence, since there was no evidence tending to show that it had any knowledge that plaintiff would be exposed to any hazard in discharging his duties, even though he should go alone to replace the plug, and it could not be held liable because, on this particular occasion, something happened that was contrary to all past experiences.

4. ———: ———: **Negligence of Master: Unusual Accident.** Where employees had been doing a certain thing in a certain way without any injurious results following, the master cannot be held liable because, on a particular occasion, something happened that was contrary to all past experiences and against which he was not called upon to guard.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey*, Judge.

Reversed.

*Percy Werner* for appellant.

(1) Under the pleadings and all the evidence which was adduced, the trial court should have directed a verdict for the defendant as requested at the close of all the evidence in the case. Chemical Co. v. Peterson, 134 Fed. 789; O'Malley v. Railroad, 113 Mo. 319; Reames v. Dry Goods Co., 99 Mo. App. 396; Berry v. Kansas City, 128 Mo. App. 374; Lawless v. Gas Light Co., 72 Mo. App. 679.

*F. A. & L. A. Wind* for respondent.

(1) The full transcript of the record on file in this court does not show that the defendant's motion for a new trial was filed at the same term of court that the judgment was rendered. There is therefore nothing before this court. but the record proper. Harding v. Bedoll, 202 Mo. 625. The court will not aid appellant by referring to any other records or make any corrections after attention has been called to the defect by respondent. Harding v. Bedoll, 202 Mo. 625; Cuoisio v. City of St. Joe, 24 Mo. App. 567; Hoffman v. Lundon, 96 Mo. App. 188; Bank v. Davidson, 40 Mo. App. 221. There is therefore nothing before this court but the record proper. Harding v. Bedoll, 202 Mo. 625. (2) Failure to provide sufficient help is a breach of duty for the consequences which a master is liable to his servant. Stoddard v. Railroad, 65 Mo. 514; Thorpe v. Railroad, 89 Mo. 650; McMullen v. Railroad, 60 Mo. App. 231. (3) (a) The servant never assumes the risk of his master's negligence. Curtis v. McNair, 173 Mo. 270. (b) It is only when the defect or danger obviously threatens immediate and imminent peril to such an extent that fair minds must agree no ordinarily prudent person would encounter it that one's right of recovery may be denied as a matter of law on the ground of contributory negligence. Schlavick v. Shoe Co., 157 Mo. App. 83; Bennett v. Lime Co., 146 Mo. App. 565; Brannock v. Railroad, 147 Mo. App. 301. (c) In acting in an emergency servants are not prevented from recovering, because they did not choose the safest method. Stephen v. Railroad, 86 Mo. 221; Root v. Railroad, 195 Mo. 348; Johnson v. Railroad, 147 S. W. 530; Brady v. Rialroad, 206 Mo. 509.

STATEMENT.—Plaintiff, an employee of the defendant gas company, claims damages for having been sickened as the result of the inhalation of illuminating

gas. According to plaintiff's petition, at the time of
the alleged occurrence he was acting as a watchman at
one of defendant's stations. He smelled escaping gas
from one of the valve houses, entered and descended
to the basement thereof, threw his electric flash light
on to the valve from which he heard the gas escaping,
saw that the wooden plug, which fitted into the oil hole,
was out, returned to the outer air, whittled a new plug,
then, feeling no ill effect from his first incursion, re-
descended and inserted the new plug, consuming less
time the second trip than on the first, and on again
ascending to the surface testified that he felt sick,
suffered nausea, etc., the ill effects of which he testifies
persisted for a number of weeks thereafter, and dis-
abled him from performing any labor from thence
hitherto. He bases his right to recover against this
defendant for his injuries on two grounds: (1) that
he "did not fully understand and appreciate the dan-
ger of going alone for so short a time into the valve
house" and defendant failed to apprise him of the
danger; (2) defendant failed "to provide help suffi-
cient so that at least two servants would descend to-
gether while a third operated from the surface an air
pump through which fresh air would be forced into
said valve house while such servants are employed
therein." Damages in the sum of $10,000 are de-
manded.

Defendant's answer was a general denial, a plea
of assumption of risk, and of contributory negligence
based on failure to take ordinary precautions.

These pleas were denied by a reply.

The jury returning a verdict in favor of plaintiff
for $1128, defendant filed its motion for a new trial
which being overruled and exception saved, defend-
ant has duly appealed to this court.

The motion for new trial was based alone on the
grounds that there was no substantial evidence upon
which to base the verdict, and on the error of the trial

court in submitting the case to the jury, and these are the errors assigned.

We confine ourselves to them, passing the action of the trial court on the matter of instructions, counsel on either side making no reference to them.

The only witness to the actual occurrence was plaintiff himself. He testified that he was working for the Laclede Gas Light Company at one of its stations at Fourteenth and Gratiot streets in the city of St. Louis, known as Station C; that there is a gas holder there where they receive illuminating gas from another station, known as A, one of defendant's plants, and it is discharged thence through mains out to different parts of the city; had been working for the company at this Station C for about four years prior to the time of the accident; his work was out in the yards and repairing gas plugs, gas pipes, supplying gas for railroad cars. Quoting plaintiff, he testified: "The valve house was ten or fifteen feet from the office. It was from twenty to thirty feet square and twenty or twenty-five feet deep, the valves setting down in the ground, and there was a curved starway that a man could go down into the valve house; if there was any leak, he could repair it. . . . It is covered with brick and roofed over. . . . The wooden plugs were to hold the valves. . . . You went down into the valve house to oil the valves, and when there was a leakage and to do any repairing. I had gone down into this valve house before the day in question, several different times, helping repair the pipes. I didn't go alone, there were always two or three men with the one who went into the valve house. Sometimes two men would be in the pit, and one or two stay on top. When any work was to be done, they have a respirator, which you put over your face, and there is a tube or hose, and on the top of the landing a man stands on the level and pumps fresh air to you while you are down working or fixing the leak, or any work to be done. If a man

stays there any length of time, he then comes up, even with the respirator, and another man goes in, change about. The man on top works the respirator. On the 8th day of March, a year ago, I was there by myself. It was my special duty to go down and look after that valve house at that time, but not before. The day before Mr. Rieger, superintendent of Station C, Fourteenth and Gratiot, came out to me in the boiler room, and told me that Hildebrandt, who was taking care of that part every day would be absent two days, and for me to take charge of it, and if anything happened, for me to look after it, repair it. He told me to watch the valve house, and attend to my business like Hildebrandt did. Hildebrandt had been attending to the valve house, and if anything occurred, if anything happened, he always called an assistant; always two or three men about there to help him fix anything. If there was any leakage in the valve house or anything, he would take a respirator and two or three men stood on top and watched him and pumped air to him. It was Saturday morning, the sixth, that I was told this. He did not say anything about anybody else being there. On Sunday nobody was there but myself, nor on Monday. On Monday I was watching in the office and passed by the valve house and smelled gas. I didn't know anybody around there, couldn't see anybody to help me, and I went to the 'phone and rang up Station A; that is the main headquarters; called the number; Station A was busy and I couldn't get them. I walked to the valve house again, it was still stronger, and I rushed down to see if I could fix it, and found the wooden plug blown out. I came to the top. I knew exactly what it was, and I made a plug on the top of the ground and rushed down there and put the plug in. As I came up, there were two sets of steps going up, and there was a railing on each side step at the top floor. As I struck the air, I kind of leaned back, I had strength enough to hold myself on the rail, and

fell afterwards, so I struggled out into the open air and walked around. I was on my hands and knees anyway. I walked long enough to vomit and the gas came up. Before I got up on the pit, nobody was around. . . . One of them (the men who came in sometime afterwards) took me home. I was not able to walk home myself. . . . They (the company) had a flash light which was used by persons going down into the valve house. This was used so it would not make an explosion in case of leakage. I had a flash light the day I went down. It was a safety lamp. I don't know that there was ever anything said to me or in my presence by the superintendent as to there being any danger arising from the escaping gas in this valve house. There had been something said about the necessity of stopping any leak of gas there. I was told to fix the leak if there was anything out of order, as it would cause damage if leaks were not stopped; that all leaks should be stopped as quickly as possible, as there might be an explosion and loss of life or property. Nobody was there when I discovered the gas.''

On cross-examination plaintiff testified that he is forty-five years of age; that the valve house was on top of the ground, the valves being underground in the chamber or basement. The first floor was open like a grill. There was an opening in the floor and there were two windows in the valve house and a ventilator on the roof. It was a one-story valve house. The windows and ventilator on the top were used for ventilating the valve house. Plaintiff testified that ''these windows and ventilators were always open. They were kept open. The ventilator was not sufficient to ventilate gas out of the valve house. I know, because the way I got as much gas as I got at the time I was there, I was only there a second. I had oiled valves in that valve house before. It didn't take any time to oil valves. I would take an oil can, take the plug out, pour some oil in and skip right out; . . . had done

some pipe work and repairing in the valve house or in the pit. Sometimes I would be there two or three seconds and I would come out. Such repairs would consist of taking out a pipe, if there was a breakage or leakage and putting in another. . . . I have used a respirator down there on several different occasions; would stay down five or ten minutes when I used a respirator, then I would come up and another man would go down. The gas would make you uncomfortable and we would take turns. If you go down there only two or three seconds, it would be uncomfortable. . . . In the afternoon about one o'clock (of the day of the happening) the smell got pretty strong, and I was certain there was a leak, and I went and got my flash light and called up Station A by telephone and didn't get an answer, and then took the flash light and went down alone. I could hear it blowing, like gas in a private house if you turn it on. The valve hole is about three-sixteenths of an inch where the wooden plugs are, or about a quarter of an inch, I believe. . . . The first time I went down to the bottom of the pit to find out what it was. I threw the flash light on so that I could see where it was, then ran upstairs and took a penknife and cut a piece of wood and made a plug for it. This didn't take very long. I don't think I was part of a second down there the first time. The leak was about three or four feet from the foot of the steps. Then I called up Station A the second time before I went down with the plug. Then I telephoned a third time to get assistance. Rieger, the superintendent, said there was danger for one man to go down there. And the telephone was busy all the time. I didn't telephone to any of the other stations, nor to the general office on Locust street, nor to any of the substations. I telephoned to Station A and then concluded I would go down alone. I had heard Rieger say not to go down alone. The second time I went down I did not stay as long as the first time; just

rushed down and pushed the plug in and ran up. When I came out the first time I felt all·right, felt good, didn't feel any ill effects from it. The second time I didn't stay as long as I did the first time, because I had located the leak and had my plug ready and used my flash light the second time. As soon as I struck the air, after I got up the second time, I felt the ill effects. . . . The respirator was only used in case of a leak. We changed off maybe every two or three minutes. . . . The plugs were used to keep gas from escaping. . . . When the plugs were out, the gas would escape. . . . The first time I went down I saw the opening from the steps, about eight or ten feet, heard the escaping gas, and knew the location, where it was. I didn't go clear down to the leak the first time. I got off the step and threw the light on it. It didn't take as long the second time to put the plug in as it took me the first time to go down and find it. . . . I had been there. . . . After this accident it was said that one man shouldn't go down there. Prior to that time it had been the custom for two men to go down, and to change rapidly, while one stayed on top and worked the respirator. That was what I expected to do if I had gotten help from Station A.''

Physicians and other witnesses testified to the physical condition of plaintiff and as to its being occasioned by exposure to the fumes of gas. This was practically all the testimony for plaintiff, beyond the testimony as to the amount of wages and his loss of time.

On part of defendant, two physicians testified that the effect of inhaling illuminating gas is either fatal or transitory; that the fatal results from breathing gas without sufficient oxygen are that the blood undergoes a change and death ensues; that the transitory is when the effects pass off and the blood becomes purified by breathing oxygen; in the latter case the recovery is without bad effects.

Rieger, superintendent for defendant in charge of
the station at which plaintiff was injured, testified that
a man named Hildebrandt was the station watchman
at that station, plaintiff acting as subordinate.    At
Station A, one of the manufacturing stations, the com-
pany defendant had about five hundred men employed
during the twenty-four hours, day and night.    At Sta-
tion C they have a watchman, day and night, each sup-
posed to serve twelve hours, who are alone.    When
they need assistance they are supposed to call for it;
told plaintiff that in case he needed assistance to call
for it.    The duties of the watchman were to take care
of the pressure and of the valves, open and close them
whenever necessary and do any ordinary work around
the premises.    The distance between Station A and
Station C is about twenty blocks.    The floor of the
valve house is open, a kind of lattice work.    There is
an opening some six feet square coming up from the
stairway and then three windows in it, one on three
sides and a door on one side and a ventilator in the
room.    The building is one story high.    If a plug came
out of a valve the gas would escape through the ven-
tilator or windows or door, naturally, out through the
ventilator, as it is lighter than the atmosphere.    No
harm would result, so far as witness could see.    Wit-
ness had been in the bottom of the valve house when
the plug was taken out of a valve; had gone down and
taken out a plug the day he testified and with no ill
effects; did it without the respirator, which was used
in case of a severe leak.    When a plug comes out of a
valve it is not called a leak, because it can be fixed im-
mediately, involves no risk nor does it require any
time to stay down there.    The gas escaping from the
pipes and into this valve house and going out through
the top could do no harm, so far as explosion is con-
cerned or damage to the premises.    Witness had as-
signed plaintiff to take the regular watchman's place
on Sunday.    Plaintiff made no complaint nor did he

ask for any assistance. He was one of defendant's old, experienced men in the work. Witness, as superintendent, had told plaintiff a number of times never to go down into the valve house without somebody was with him, simply as a matter of precaution in case there was a leak.

On cross-examination this witness testified that the reason he told plaintiff and others not to go down in the valve house was that there might be a leakage of gas that would cause them to be overcome. The watchman is always left in this station alone and each station is equipped with Bell and Kinloch telephones.

Other witnesses for defendant testified as to the manner of operating, the details connected with the operation of the plant and that they had frequently gone down to replace valves without any ill effects.

REYNOLDS, P. J. (after stating the facts).— These are the facts in the case. The sole question submitted to us and which we shall consider is, whether they authorized the submission of the case to the jury, or that being done, whether, on all the evidence, they are sufficient to sustain the verdict. Counsel for appellant argues that even on the petition itself, inasmuch as plaintiff's excuse is that he did not "fully understand" the danger, that he has pleaded himself out of court; that this, in itself, is insufficient as an excuse for an assumption of risk. Without considering this as a matter of pleading, or in that aspect, but looking at it in connection with the facts in the case, we are inclined to think that the criticism is hardly to be sustained. The rule is that if one fully conscious of the danger, assumes the risk and is injured, he cannot recover, and it may be said that if he did not fully realize it, he ought to recover. But we do not pass on the petition. We are confining ourselves here to the evidence and considering the point made as to its sufficiency or insufficiency to sustain the verdict.

Preliminary to inquiry into this, however, there is a question duly raised by counsel for respondent as to the failure of the abstract to show that the motion for a new trial was filed during the term at which the judgment was rendered. For lack of this appearing in the record or in the abstract, counsel for respondent claims that there is nothing before us for consideration but the record proper. We think this objection has been overcome by what took place in this court after the case reached us. Counsel for appellant suggesting diminution of the record, *certiorari* duly issued to the clerk of the circuit court, as provided by section 2052, Revised Statutes 1909, to send up a complete record. The clerk thereupon filed a certificate which, by stipulation of counsel, was accepted in lieu of a complete transcript and by consent, the record and abstract were amended, so that it now appears that on the 2d of April, 1910, and during the February, 1910, term of the circuit court, an order was entered of record in the circuit court, continuing all demurrers, motions and causes then pending until the next term of the court. By the record it appears that the judgment was rendered on March 8, during the February term, 1910, of the court and that the motion for new trial was filed on March 10, 1910. There is, therefore, no question but that it was filed within the four days provided by statute. The question then is, did March 10 fall within the February term of the court, the transcript not reciting that in so many words. We have held that it not appearing that the motion for new trial had been filed at the term at which the judgment was rendered, proceedings in the cause, outside of those shown by the record proper, were not open to our review, and that while we take judicial notice of the commencement of a term of court we cannot do that as to its ending. [See Breimeyer v. Star Bottling Co., 136 Mo. App. 84, 117 S. W. 119.] In that case there was not only no recital that the motion had been filed

at the same term at which the judgment was rendered,
but nothing in the record to inform us as to that or
from which we could determine when the term ended.
In the case at bar we have facts in the record as
amended, from which we can determine when the Feb-
ruary term ended.  As stated the motion for a new
trial was filed on March 10, 1910, two days after the
rendition of the judgment.  By the amended tran-
script we are advised that the February, 1910, term of
the court did not end until April 2, 1910.  Hence we
have here before us in the record evidence from which
we can with certainty determine that when the motion
for a new trial was filed, the February, 1910, term had
not elapsed.  [See Ray County Savings Bank v. Hut-
ton, 224 Mo. 42, 123 S. W. 47; Nickey v. Leader, 235
Mo. 30, 138 S. W. 18.]  The bill of exceptions contain-
ing the evidence and proceedings in the case is there-
fore before us for our consideration.

Turning then to the consideration of the facts, as
they there appear, and which we have set out prac-
tically in full, we are unable to sustain the verdict and
judgment in this case.  It is clear that plaintiff was a
man of full age, forty-five years, and an experienced
pipe fitter, one who had worked for defendant around
this station for something over four years.  It is also
clear by his own testimony, that it was considered
dangerous to venture down into this valve room, as
we may call it, alone, if the gas pipes were leaking.
He had been warned of that danger.  He knew that
under the rules of the company, and by the practice of
its employees, repairs of leaks always had been made
by at least two men, generally three; that when it was
necessary to go into this place to stop leaks, a respira-
tor was used by the man who went into the pit.  His
excuse, that he was not fully aware of the danger, is
not supported by the evidence in the case.  He knew
that if there was a leak it was not only against the rule
of the company, but against its practice, for one man

to attempt to stop a leak alone. The danger of going down alone, was therefore one of which he had been warned and was obvious. The claim of plaintiff, when analyzed, really is, that knowing the danger and the risk, he thought he would take a chance. This will not relieve one from his contributory negligence.

So much as to the case, if the displacement of the plug is to be classed as a leak. But it was not that, technically, nor as considered by the plaintiff himself or as treated by the company. It was the not unusual case of a plug blowing out. There is not only no evidence in the case to indicate that the employer or its representatives had either any knowledge or any reason to believe that plaintiff, in disregard of positive directions to the contrary, would assume the risk of going alone to replace a plug; nor are there any facts in evidence, even assuming that the defendant, the employer and its representatives, knew or expected that the watchman or other employees, when a valve came out of the pipes, would go down alone to replace it, that he thereby incurred any risk of injury or ill effect from doing that. Plaintiff's own testimony was that he had done that on many occasions without any injury. The testimony of the superintendent immediately in charge of the work was that it had been done on many occasions without any ill effect. Plaintiff himself testified that on this occasion the first time he went down and discovered, not a leak, but that the plug was out, it took him less than a second's time, and that when he went down again after cutting a plug, it took him less time than it did the first to go down, insert the plug and get back to the open air.

In O'Malley v. Missouri Pac. Ry. Co., 113 Mo. 319, l. c. 329, 20 S. W. 1079, our Supreme Court said, speaking of smoke in a tunnel which it was claimed had suffocated the husband of the plaintiff and caused his death, "There is no evidence which tends to prove that any officer of the defendant could have anticipated a

condition of the tunnel which was dangerous to human
life.  After thirteen years of use without the develop-
ment of danger of injury or death from smoke and gas,
unless it has been shown that defendant's roadmaster
knew, or had means of knowledge, that unusual conse-
quences would result to deceased from going into the
tunnel on this occasion in obedience to the order, there
was no negligence in giving such order, though in fact
the tunnel at the time was filled with noxious and
poisonous gases.''  The judgment in that case which
had been for plaintiff was reversed without the cause
being remanded.  It seems to us that the facts in the
case at bar come within the rule of law there an-
nounced; if there is any difference, the case at bar pre-
sents a stronger one for the application of the prin-
ciple there announced.  Plaintiff himself testifies that
he had frequently ran down into this valve house to re-
place plugs that had been blown out without using the
respirator and without being accompanied by any one
and without any ill effect.  So did other witnesses.
There is no evidence in the case to show that the escape
of gas on this occasion was worse than any other by
reason of the misplaced or displaced plug.  So far as
the knowledge of defendant, through its officers, is con-
cerned, the testimony is positive and uncontradicted
that the superintendent himself and others had fre-
quently gone down, inserted these plugs when dis-
placed and returned without any ill consequences.
Clearly the time within which it could be done was so
infinitesimal, according to plaintiff's own testimony
taking less than a second, that it is not possible to be-
lieve that any one could have supposed serious conse-
quences would follow from such brief exposure to the
escaping gas.  As plaintiff himself says, it escaped as
gas does in a house when a burner is open.  If it had
been a leak, it might have been a different matter.
Hence dismissing the question as to whether plaintiff

should have waited until other men were there or until some one had been there to operate the respirator, and that defendant was negligent in leaving plaintiff there alone, we, are unable to find any testimony in the case which carries any knowledge to the defendant or its officers and representatives that plaintiff would be exposed to any hazard in the discharge of the duties to which he was assigned, even if he went alone to replace a plug. Somewhat in line with this case are those of Roessler & Hasslacher Chemical Co. v. Peterson, 134 Fed. 789, and Berry v. Kansas City, 128 Mo. App. 374, 107 S. W. 415, in each of which a recovery was denied plaintiffs. See also Bradley v. Chicago, M. & St. P. Ry. Co., 138 Mo. 293, 1. c. 310, 39 S. W. 763.

Learned counsel for respondent argue that plaintiff never assumed the risk of his master's negligence, citing in support of this Curtis v. McNair, 173 Mo. 270, 73 S. W. 167. That is true as a general proposition. But so far from that decision sustaining the contention of these counsel, we think that it makes against them. Judge VALLIANT, delivering the opinion of the court, says (l. c. 279): "A servant assumes the risk of danger incident to the work he engages to perform, and if he is injured as a result of that which was to be expected in the usual course of such work, the master is not liable. There are many kinds of business, the operations of which are attended with danger which cannot be prevented by ordinary care and precaution. When one engages in such business and suffers from causes incident to its character, he has no legal remedy. In such case he suffers not because of negligence of his master, but because of a danger incident to the business. But the only risk the servant does assume, is of that which is liable to happen on account of the nature of the business when the master has used reasonable care to avoid such a result. It is the duty of the master to exercise reasonable care, commensurate with the nature of the business, to protect his servant

from the hazards incident to it.'' Applying that to the case at bar, the evidence shows that the master, the employer, in this case, had provided means, prescribed regulations, which were intended to prevent danger from one employee going alone into a place where gas was leaking and where it was escaping in such quantity as to endanger life; that plaintiff was aware of these precautions. He had been cautioned not to attempt, in case of an escape of gas from a leak, not to venture into this place alone. If we are then to assume that the gas was escaping in unusual quantities as from a leak, he had no business to attempt to repair it unassisted and unprotected; on the other hand, if it was a mere matter of a plug coming out and which he and others had been in the habit of replacing alone. and without using the respirator, and without suffering any ill consequences, it is impossible to hold the master, the employer, responsible, because on this particular occasion something happened that was contrary to all past experiences and against which he was not called upon to guard.

On consideration of the case and examination of the authorities cited by counsel for respondent, we are unable to find any which support their contention. Our conclusion is that the learned trial court erred in submitting the case to the jury without a direction to find for the defendant below; that the case was not one entitled to go to the jury on the evidence, and that the verdict and judgment are wrong.

The judgment of the circuit court in this cause is accordingly reversed. *Nortoni* and *Caulfield, JJ.,* concur.